IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ELIZABETH HANSEN, Individually, and ELIZABETH HANSEN, Personal Representative of the Estate of Michael Hansen, deceased,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>                    Defendant. | **8:21CV371**<br><br><br>**MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS IN LIMINE** |

This case under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671 *et seq*., arises from the tragic death of a military veteran after medical staff at a Veterans Administration Hospital discovered but failed to disclose and follow up on a treatable form of lung cancer until it had become incurable. Filing 109 at 1 (¶ 1). "Defendant admits that it was negligent, and that Plaintiff is entitled to relief, but disputes the nature and extent of Plaintiff's damages" on claims of "medical negligence" and "negligent failure to warn." Filing 113 at 7 (¶ 42); *see also* Filing 76 at 42 (¶ 42). This case is set for a non-jury trial beginning on December 12, 2023. Filing 120. This case is now before the Court on Defendant's Motion in Limine to Exclude Certain Opinions of Plaintiff's Economist Dr. William Rogers, Filing 126, and Defendant's separate Motion in Limine listing nine categories of evidence that Defendant argues should be excluded, Filing 129. For the reasons set out below, the first Motion is denied, and the second Motion is granted in part and denied in part.

1

# I.  INTRODUCTION

## A.  Factual Background

Because this case is set for a bench trial and liability is admitted, the Court will only briefly touch on the factual background to the case.[1] Decedent Michael Hansen was a U.S. Army veteran and resident of Omaha, Douglas County, Nebraska. Filing 109 at 2 (¶ 2). Elizabeth Hansen is the widow of Michael Hansen and the personal representative of his Estate. Filing 109 at 2 (¶ 3). Elizabeth Hansen is also a resident of Omaha, Douglas County, Nebraska. Filing 109 at 2 (¶ 3). The Hansens were married from 2004 until 2021. Filing 109 at 2 (¶ 4). The Court will refer to the Hansens collectively as "the Hansens" and separately as "Michael" and "Elizabeth." The Court will refer to Elizabeth Hansen in her capacity as an individual plaintiff and as the representative of the Estate as "Plaintiff."

In June and July 2019, Michael underwent in-patient treatment for digestive and intestinal issues at the Veterans Administration Medical Center in Omaha, Nebraska (VA-Nebraska). Filing 109 at 3 (¶ 15), 4 (¶ 21). Radiologist Dr. Jack Vonk observed a mass on Michael's right lung in a CT scan taken on July 2, 2019. Filing 109 at 4 (¶ 23). Plaintiff alleges that the mass was approximately two centimeters in diameter at that time. Filing 109 at 4 (¶ 23). In his Radiology Report, Dr. Vonk described the CT findings as a "POSSIBLE MALIGNANCY." Filing 109 at 5 (¶ 24). The parties agree that Dr. Vonk reported his findings to Dr. Rivard, who was Michael's surgeon, and Plaintiff also alleges that Dr. Vonk reported it to other VA-Nebraska doctors. Filing 109 at 5 (¶ 25). The parties agree that despite noting the presence of the mass, no follow-up on the mass was conducted by Michael's doctors at VA-

---

[1] Unless otherwise indicated, the facts set out here are alleged in the Amended Complaint, Filing 109, and undisputed—or are stated to the extent they are undisputed—in the Answer to First Amended Complaint, Filing 113.

Nebraska. Filing 109 at 5 (¶ 26). Michael was likewise not told about the potential tumor or that

he might have cancer until October 2020. Filing 109 at 6 (¶ 32).

In October 2020, Michael returned to VA-Nebraska complaining of various ailments.

Filing 109 at 6 (¶ 30). Additional scans revealed that the mass in his right lung was then

approximately four centimeters in diameter and that there was another mass in his left lung that

measured 3.5 centimeters in diameter. Filing 109 at 6 (¶¶ 31–32). A biopsy performed on the

right-lung mass showed it was Stage IV Adenocarcinoma, where Stage IV is the most advanced

stage of cancer. Filing 109 at 6 (¶ 33). After learning of Michael's cancer diagnosis, Michael and

Elizabeth had a meeting on October 27, 2020, with VA employees Dr. Gary Gorby, the Chief of

Medicine at VA-Nebraska, and Ms. Laura Whale, the Risk Manager at VA-Nebraska. Filing 109

at 6 (¶ 32); *see also* Filing 109 at 3–4 (¶ 18) (identifying Dr. Gorby's and Ms. Whale's

positions). Dr. Gorby and Ms. Whale apologized on behalf of the VA for the failure to conduct

appropriate follow-up on the mass growing on Michael's lung. Filing 109 at 7 (¶ 35). The parties

agree that Dr. Gorby and Ms. Whale admitted that something had been missed and that they

wanted to apologize; that the mass on Michael's right lung had been observed in 2019, but no

one at VA-Nebraska had followed up on it; that when a mass the size of the one on Michael's

lung had been found, there should have been a follow-up CT scan or a diagnostic test of the

mass, but that was not done; and that VA-Nebraska had "messed up." Filing 109 at 7 (¶ 36). The

parties dispute whether Dr. Gorby and Ms. Whale also admitted that had follow-up been done in

2019 when the mass was first found, Michael could have had different treatment options for the

cancer and would have been in a better position to make an informed decision. *Compare* Filing

109 at 7 (¶ 36(d)), *with* Filing 113 at 6 (¶ 36(d)).

3

On December 30, 2021, Hansen passed away as a result of his lung cancer. Filing 109 at 7 (second ¶ 36).

## B.  Procedural Background

In her Amended Complaint, Plaintiff asserts two causes of action, the first for "medical negligence" and the second for "negligent failure to warn." Filing 109 at 7–11 (¶¶ 37–49). The Amended Complaint contains a third cause of action for "negligent hiring, training, and supervision," but Plaintiff acknowledged that the Court previously dismissed that cause of action with prejudice, and Plaintiff states that third cause of action is included "[f]or purpose of the record." Filing 109 at 12 and n.1. In a separate section of the Amended Complaint entitled "DAMAGES COMMON TO ALL CAUSES OF ACTION IN PLAINTIFF'S COMLAINT," Plaintiff has separate subsections for "Michael's Damages (Wrongful Death and Survival)" and "Lisa's Damages." Filing 109 at 14–17. Plaintiff alleges,

Michael received injuries and incurred the following damages:

(a)     Past and future lost earnings, including loss of future earning capacity;

(b)     Past and future medical expenses;

(c)     Physical and mental pain, suffering, anguish, and emotional distress;

(d)     Disfiguration, embarrassment, humiliation, inconvenience, and loss of enjoyment of life;

(e)     Temporary and permanent disability and injury; and

(f)      Death.

Filing 109 at 14 (¶ 58). In another paragraph purportedly pertaining to Michael's damages, Plaintiff alleges the following:

60. (*Wrongful Death Claim*) As a direct and proximate result of the improper actions, improper omissions, negligence, and/or malpractice of the VA physicians, the VA, and VA-Nebraska, along with their agents, staff and nurses, as set forth above, Michael died. Lisa—who was Michael's spouse and next-of-

4

kin—has suffered and will continue to suffer damages, including but not limited to past and future emotional distress, financial support, and loss of Michael's society, comfort, companionship, services, support, earnings, consortium, counsel, guidance, care, love, affection, attention, protection, aid, and assistance, as provided by Nebraska law.

Filing 109 at 15 (¶ 60) (emphasis in original). Thus, this paragraph is actually about Elizabeth's damages. A third paragraph also pertaining to Michael's damages, alleges the following:

> 61.    (*Survival Claim*) At the time of his death, Michael was 68 years old. At the time of his death, Michael had remaining life expectancy, which he did not get to enjoy due to his premature death. As a direct and proximate result of the improper actions, improper omissions, negligence, and/or malpractice of the VA physicians, Michael endured and suffered damages, including but not limited to pain and suffering, apprehension of death, loss of chance, medical expenses, funeral and burial expenses, loss of earnings, and other damages, which are compensable to Michael's estate under Nebraska law.

Filing 109 at 15 (¶ 61).

In the subsection pertaining to "Lisa's Damages," Plaintiff alleges first,

Lisa has incurred and/or will be incurring the following damages:

(a)    Loss of consortium, including but not limited to the loss of Michael's affection, love, companionship, comfort, assistance, services, moral support, and the enjoyment of relationship;

(b)    Wrongful death damages provided under the law, including, but not limited to, emotional distress, loss of financial support, and the loss of Michael's society, comfort, companionship, services, support, earnings, consortium, counsel, guidance, care, love, affection, attention, protection, aid, and assistance; and

(c)    Healthcare, medical, hospital, funeral, and burial expenses and services, as well as the past and future loss of Michael's earnings, earning capacity, and wages.

Filing 109 at 16 (¶ 63). Plaintiff then alleges the following:

> 64.    As a direct and proximate result of the improper actions, improper omissions, negligence, and/or malpractice of the VA physicians, the VA, and VA-Nebraska, Lisa has lost, and will continue to lose in the future, the affection, assistance, care, comfort, companionship, love, society, and support of her deceased spouse, Michael.

65.     At all times material herein, Lisa had an intimate familial relationship with Michael, who was Lisa's husband. Lisa was a witness to (a) the aforesaid improper actions, improper omissions, negligence, and/or malpractice of the VA physicians, the VA, and VA-Nebraska with regard to her husband, and (b) the damages, injuries, and pain and suffering (as well as what will be an eventual death of her husband) that Michael has suffered due to such improper actions, improper omissions, negligence, and/or malpractice. As a direct and proximate result of the improper actions, improper omissions, negligence, and/or malpractice of the VA physicians, the VA, and VA-Nebraska, Lisa has suffered past and future severe emotional anguish and distress, post-traumatic stress disorder, mental harm and injuries, and physical injuries.

Filing 109 at 16–17 (¶¶ 64–65).

This case is set for a non-jury trial beginning on December 12, 2023. Filing 120. As indicated at the beginning of this decision, it is now before the Court on two evidentiary motions by Defendant, which the Court will consider in turn.

## II.  LEGAL ANALYSIS

### A.  The Challenge to Plaintiff's Economist

The first motion before the Court is Defendant's Motion in Limine to Exclude Certain Testimony of Plaintiff's Economist Dr. William Rogers. Filing 126. As background to this Motion, Defendant asserts that Dr. Rogers, an economist, provided an estimate of Michael's lost benefits and family services. Filing 128 at 1; *see also* Filing 132 at 2 (stating that this is one of the areas on which Dr. Rogers will offer an opinion). Defendants assert that Dr. Rogers seeks to assign a pecuniary value to Michael's leisure time with Elizabeth by comparing it to personal care and service occupations. Filing 128 at 1. The Court begins its analysis of this Motion with a summary of the parties' arguments.

#### 1.     *The Parties' Arguments*

Defendant clarifies that its Motion is limited to exclusion of the family services portion of Dr. Rogers's opinion and all calculations related to that opinion. Filing 128 at 2. Defendant argues that Dr. Rogers should be prohibited from mentioning or introducing evidence at trial

concerning his calculation of Elizabeth's loss of family services because his methodology for calculating such loss is not based on reliable principles and methods generally accepted in the field of economics. Filing 128 at 2. Defendant argues that Nebraska law is clear that determination of pecuniary value of such losses is properly left to the factfinder, and Defendant argues that FTCA cases tried to a judge rather than a jury do not change that principle. Filing 128 at 3. Defendant asserts that Dr. Rogers compared Michael's loss of leisure time to personal care and service occupations, opining that Michael spent an average of 33.90 hours a week with Elizabeth doing activities like going out to dinner, attending movies and high school sporting events, and visiting friends. Filing 128 at 3–4. Defendant argues that Dr. Rogers then determined that those leisure activities were comparable to occupations like a passenger vehicle driver, amusement and recreational attendant, or coatroom attendant, resulting in a lost hourly wage value of $16.16 that would continue for the rest of Michael's life expectancy. Filing 128 at 4. Defendant argues Dr. Rogers attempts to compare incomparable things, which renders his methodology unreliable. Filing 128 at 5. Defendant asserts that such a methodology has never been subjected to peer review and publication. Filing 128 at 5. Consequently, Defendant argues Dr. Rogers's opinion on this issue must be excluded. Filing 128 at 5.

Plaintiff responds by pointing to Dr. Rogers's education, teaching positions, and the fifteen to twenty times he has testified on the topic of lost family services. Filing 132 at 3. Plaintiff also argues that there does not need to be an existing market for the tasks at issue—such as cooking for oneself—when doing an opportunity cost analysis, because a pecuniary value can still be established. Filing 132 at 3. Plaintiff asserts that the opportunity cost methodology for estimating pecuniary losses in wrongful death cases has been well-established in the forensic economic community since at least the 1980s and that Dr. Rogers has testified to a similar

methodology in numerous other courts. Filing 132 at 4. Plaintiff also asserts that Dr. Rogers's colleagues at his current firm have testified using the same opportunity cost methodology in wrongful death cases in Nebraska and other federal courts. Filing 132 at 4–5. Plaintiff expands on Defendant's description of Dr. Rogers's methodology by pointing out that he interviewed Elizabeth and made estimations from the information she provided to compare activities Michael and Elizabeth pursued with the tables published in *The Dollar Value of a Day*, 2020 (*The DVD*). Filing 132 at 5. Plaintiff contends that *The DVD* is widely used by forensic economists as a reliable source in calculating the pecuniary value of family services a person provides. Filing 132 at 5. Plaintiff then argues that because there is no definite formula or legal rule for the factfinder to determine pecuniary loss in a wrongful death case, and the factfinder has wide discretion to calculate such loss, Dr. Rogers's calculations will be helpful to the factfinder. Filing 132 at 11–12. Plaintiff also argues that Dr. Rogers's opinions will not usurp the Court's province as the factfinder. Filing 132 at 12. Ultimately, Plaintiff contends, Defendant's criticisms go to the weight not the admissibility of the challenged opinions. Filing 132 at 13.

In reply, Defendant argues that it is "of no import" that Dr. Rogers may use a "well-established" opportunity cost methodology when he arrives at such speculative opinions based on speculative underlying assumptions. Filing 144 at 1–2. Defendant acknowledges that the methodology Dr. Rogers used has been used by economists to value the household production time of homemakers, but Defendant argues that Michael was not a homemaker and did not spend his time in "homemaking" activities. Filing 144 at 2. Defendant argues that even if there is no strict formula for calculating the loss at issue here, that does not necessarily mean that Dr. Rogers's opinions are based on a reliable methodology when there is no comparable occupation for Michael's leisure activities. Filing 144 at 2–3.

2.      *Applicable Standards*

A district court's determination on the admissibility of expert testimony is reviewed for abuse of discretion. *United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023). Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony and give the district court "a gatekeeper function" to ensure that expert testimony is relevant and reliable. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, 142 S. Ct. 2731 (2022). Somewhat more specifically,

> Rule 702's screening requirement has been boiled down to a three-part test. First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant. Second, the expert must be qualified to assist the finder of fact. Third, the testimony must be reliable or trustworthy in an evidentiary sense.

*In re Bair Hugger*, 9 F.4th at 777 (internal quotation marks and citations omitted).

As to the first requirement, an expert's opinion lacks relevance if it does not fit the facts of the case. *McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021). On the other hand, "Rule 702 is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Perry*, 61 F.4th at 606 (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)). As to the second requirement, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Thus, an expert is qualified if for example the expert's degrees and training gave the expert competence for the subject area of the expert's testimony. *Perry*, 61 F.4th at 606. However, the Eighth Circuit Court of Appeals has also reiterated that "'[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility,'" and "the weight given to witness testimony is the province of the jury." *Id.* (quoting *Robinson v. GEICO Gen.*

*Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)). The third requirement, reliability, involves consideration of several factors:

> These factors are (1) whether the expert's theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error of the theory or technique, and (4) whether the technique or theory is generally accepted. Factors recognized since *Daubert* include whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

*In re Bair Hugger*, 9 F.4th at 777 (internal quotation marks omitted). "[A] district court may exclude expert testimony if it finds 'that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* at 777–78 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "[T]o put it in the language we have frequently used both before and after *Daubert* and *Joiner*, a district court may exclude an expert's opinion if it is 'so fundamentally unsupported' by its factual basis 'that it can offer no assistance to the jury.'" *Id.* at 778 (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)). On the other hand, the "general rule" is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Id.* at 778.

It is also wise to keep in mind that *Daubert* and its progeny "call for the liberal admission of expert testimony." *In re Bair Hugger*, 9 F.4th at 777. Thus, "the rejection of expert testimony is 'the exception rather than the rule.'" *Perry*, 61 F.4th at 606 (quoting *Robinson*, 447 F.3d at 1100). Finally, the Supreme Court has said, and the Eighth Circuit has reiterated, "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of addressing 'shaky but admissible evidence.'" *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

3.      *Even if Dr. Rogers's Challenged Opinion Is on "Shaky" Ground, It Is Admissible*

Applying the three-part test described in *In re Bair Hugger*, 9 F.4th at 777, exclusion of Dr. Rogers's challenged testimony is not warranted. Defendant does not dispute Dr. Rogers's qualifications as an expert. *See generally* Filing 128; *see also In re Bair Hugger*, 9 F.4th at 777 (explaining that second requirement of Rule 702 and Daubert is that the expert is qualified to assist the finder of fact). Rather, Defendant argues lack of reliability, although that argument is based in part on lack of a proper factual basis for the opinion. Filing 128 at 3–5; *see also In re Bair Hugger*, 9 F.4th at 777–78 (third requirement and explaining the need for an adequate factual basis).

To be admissible, an expert's testimony "must be reliable or trustworthy in an evidentiary sense." *In re Bair Hugger*, 9 F.4th at 777 (also setting out factors involved in consideration of reliability). Bearing in mind the considerations that courts use to determine reliability, *see id.*, the Court concludes that Dr. Rogers's challenged opinion is sufficiently reliable to be admissible. The Court considers first whether the expert's theory or technique has been tested, peer reviewed, and is generally accepted. *See id.* Plaintiff points out that the opportunity cost methodology for estimating pecuniary losses in wrongful death cases has been well-established in the forensic economic community since at least the 1980s and that Dr. Rogers has testified to similar methodology in numerous other courts. Filing 132 at 4. Plaintiff also asserts that Dr. Rogers's colleagues at his current firm have based their testimony in wrongful death cases in Nebraska and other federal courts on the same opportunity cost methodology. Filing 132 at 4–5. Finally, Plaintiff asserts that *The DVD* is widely used by forensic economists as a reliable source in calculating the pecuniary value of family services a person provides. Filing 132 at 5. The Court notes that because the admissibility of expert testimony should be "liberal," *see In re Bair*

*Hugger*, 9 F.4th at 777, strict adherence to each factor stated as a consideration for determining reliability is inappropriate. Liberally construing the "general acceptance" factor, Plaintiff has presented sufficient evidence to show that Dr. Rogers's methodology is generally accepted.

As to Defendant's contention that Dr. Rogers offers only speculative opinions based on speculative underlying assumptions, Filing 144 at 1–2, the Court concludes that this is not an instance where there is "simply too great an analytical gap between the data and the opinion proffered." *In re Bair Hugger*, 9 F.4th at 777–78 (quoting *Joiner*, 522 U.S. at 146). While the connections between data about homemakers, recreation services occupations, and a spouse who generally was not involved in homemaking activities is perhaps "shaky," Dr. Rogers did interview Elizabeth about her activities with Michael and made an attempt at a reasoned comparison, not just speculation based on speculation. To put it another way, Dr. Rogers's opinion has sufficient "fit" to the facts of the case to have some relevance—not least because the Court is the factfinder and is perhaps less susceptible to being led astray by testimony with the imprimatur of an expert opinion than a jury might be. *McMahon*, 5 F.4th at 903. Thus, Dr. Rogers's opinion is not "'so fundamentally unsupported' by its factual basis 'that it can offer no assistance to the [factfinder].'" *In re Bair Hugger*, 9 F.4th at 778 (quoting *Loudermill*, 863 F.2d at 570).

In short, the Court concludes that this is a case in which the appropriate means of addressing "shaky but admissible [expert] evidence" are "'[v]igorous cross-examination, presentation of contrary evidence,'" and—where the Court is the factfinder[2]—careful consideration of the burden of proof. *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509

---

[2] The Court notes that a significant factor in its analysis to allow this expert testimony at trial is the reality that the Court is the factfinder in this case. If this case were being tried to a jury, the Court's consideration of potential for confusing the issues, misleading the jury, wasting time or prejudice to the Defendant may very well have resulted in the Court deciding that this expert testimony should be excluded. Fed. R. Evid. 403.

12

U.S. at 596). Defendant's Motion in Limine to Exclude Certain Opinions of Plaintiff's Economist Dr. William Rogers is denied.

### B. The Challenges to Nine Categories of Evidence

The Court turns to consideration of Defendant's Motion in Limine listing nine categories of evidence that Defendant argues should be excluded. Filing 129. Defendant's Brief in Support consolidates those nine categories of evidence under seven headings. Filing 131. The Court will address them in turn.

#### 1. *Liability, Apologies, and the Timing of the Admission of Liability*

Categories 1 and 2 in Defendant's Motion are, respectively, "[a]ny reference to the United States' liability and any apologies made to Plaintiff or Mr. Hansen" and "[a]ny reference to the timing of the United States filing its amended answer admitting liability for Mr. Hansen's death." Filing 129 at 1. However, Defendant's Brief in Support combines them under the single heading "PLAINTIFF SHOULD BE PRECLUDED FROM REFERRING TO THE UNITED STATES OR OMAHA VA HOSPITAL'S LIABILITY OR THE TIMING OF THE UNITED STATES ADMISSION OF LIABILITY." Filing 131 at 2.

##### a. The Parties' Arguments

Defendant argues that by admitting that the Omaha VA Hospital was negligent, the Defendant also admitted that it owed a duty to Michael, it breached that duty, and its breach caused some damages to Plaintiff in an amount subject to dispute. Filing 131 at 2. Consequently, Defendant argues that any evidence, testimony, or argument about the nature and extent of the VA's liability is irrelevant and highly prejudicial. Filing 131 at 2. Defendant asserts that the irrelevant and/or prejudicial evidence includes, but is not limited to, "how or why the Omaha VA Hospital failed to schedule any follow-up on Mr. Hansen's CT scan, the VA's Lung Cancer Screening Registry, Lung Nodule Tracking System (aka Fleischner Tracking System), and any

apology the Omaha VA Hospital offered at the institutional disclosure or otherwise." Filing 131 at 2. Similarly, Defendant argues, Plaintiff should be precluded from offering evidence, testimony, or argument referring to the timing of Defendant's admission of liability, because any suggestion that Defendant should have admitted liability sooner is inflammatory, highly prejudicial, and certainly outweighs any probative value. Filing 131 at 2–3.

In response, Plaintiff represents that she "does not intend to introduce significant information regarding the timing of the Government's admission of liability." Filing 133 at 10. She asks the Court to take judicial notice of Defendant's Amended Answer filed on October 27, 2022, because Plaintiff bears the burden of presenting evidence on negligence. Filing 133 at 10. She argues that Defendant's request to prevent any reference to its liability is "overbroad" and "vague." Filing 133 at 11. Plaintiff argues that "Defendant has played fast and loose with what its admission means." Filing 133 at 11. For example, Plaintiff points out that Defendant later argues that evidence of her emotional distress damages should be excluded, but that means that there appear to be existing liability issues for the Court to decide. Filing 133 at 11. Consequently, Plaintiff argues that the Court should deny this part of Defendant's Motion and defer ruling until there is a specific objection at trial. Filing 133 at 11.

In reply, Defendant asserts that the Court already sustained Defendant's objections to discovery on issues related to liability. Filing 143 at 2 (citing Filing 101). Defendant argues that Plaintiff has not offered any basis for the Court to change its opinion at trial, so "all evidence," testimony, and argument related to Defendant's liability is irrelevant and highly prejudicial. Filing 143 at 2.

b. The Challenged Evidence is Irrelevant and/or Would Waste
   Time

As the parties are well aware, "Federal Rule of Evidence 401 says that '[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Williams v. Baum*, 48 F.4th 571, 573 (8th Cir. 2022) (quoting Fed. R. Evid. 401). The Eighth Circuit Court of Appeals has explained, "This threshold is 'quite minimal.'" *United States v. Walker*, 68 F.4th 387, 392 (8th Cir. 2023) (quoting *United States v. Nadeau*, 598 F.3d 966, 968 (8th Cir. 2010)). To be admissible, evidence must be relevant. Fed. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible.").

As the parties are also well aware, "under Rule 403, relevant evidence may be excluded 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Walker*, 68 F.4th at 392 (quoting Fed. R. Evid. 403); *see also Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1071 (8th Cir. 2021) (referring to the considerations set out in Rule 403 as "Rule 403's balancing factors"). The Eighth Circuit Court of Appeals will "afford 'great deference' to a district court's determination that evidence is inadmissible under Rules 402 and 403." *Id.* (quoting *United States v. Pumpkin Seed*, 572 F.3d 552, 558 (8th Cir. 2009)). While some of the concerns set out in Rule 403—such as misleading, confusing, or inflaming the jury—have greater importance in a jury trial than in a non-jury trial, the Court is putting the parties on notice that even in a non-jury trial the Court is sensitive to "undue delay, wast[e] of

15

time, [and] needless[ ] present[ation of] cumulative evidence." *See Walker*, 68 F.4th at 392 (quoting Fed. R. Civ. P. 403).

Where Defendant has expressly (and repeatedly) averred that it "admits that it was negligent, and that Plaintiff is entitled to relief, but disputes the nature and extent of Plaintiff's damages," *see* Filing 113 at 7 (¶ 42); *see also* Filing 76 at 42 (¶ 42), no further evidence is required on liability, such as evidence on "how or why the Omaha VA Hospital failed to schedule any follow-up on Mr. Hansen's CT scan, the VA's Lung Cancer Screening Registry, Lung Nodule Tracking System (aka Fleischner Tracking System), and any apology the Omaha VA Hospital offered at the institutional disclosure or otherwise." Filing 131 at 2. The Court also agrees with Defendant that the timing of Defendant's admission is irrelevant to the damages issues properly before the Court, and Plaintiff has not argued otherwise.

Nevertheless, in opposing this part of Defendant's Motion in Limine as "overbroad" and "vague," at least as to other evidence related to liability, Plaintiff argues that "Defendant has played fast and loose with what its admission means." Filing 133 at 11. Thus, what evidence is admissible or inadmissible in light of Defendant's admission of liability is encompassed by this part of Defendant's Motion in Limine. It appears to the Court that it is Plaintiff not Defendant who is "play[ing] fast and loose with what [Defendant's] admission means." *Contra* Filing 133 at 11. This is clear from the content and context of the admission.

In the Amended Complaint, Plaintiff alleged, in its first cause of action for "medical negligence" that "[t]he VA, VA-Nebraska, and U.S.A. are vicariously liable for the negligence of the VA physicians, including, but not limited to, under the FTCA and all theories of agency and/or the doctrine of *respondeat superior*." Filing 109 at 10 (¶ 42). Plaintiff also alleged, "The United States of America is vicariously liable for the negligence of the VA and VA-Nebraska,

including, but not limited to, under the FTCA and all theories of agency and/or the doctrine of *respondeat superior*." Filing 109 at 10 (¶ 43). In response, Defendant averred, "Defendant admits that it was negligent, and that Plaintiff is entitled to relief, but disputes the nature and extent of Plaintiff's damages. Any negligence be found on behalf of its employees [sic], the negligence is imputed and chargeable to it under the Federal Tort Claims Act." Filing 113 at 7–8 (¶¶ 42–43). Identical allegations and responses appear as to the second cause of action for "negligent failure to warn." Filing 109 at 11 (¶¶ 48–49); Filing 113 at 8 (¶¶ 48–49). It could not be clearer that Defendant admitted negligence on the two expressly stated negligence causes of action but disputed the nature and extent of Plaintiff's damages on those causes of action.

Defendant makes essentially identical responses to several paragraphs of the parts of the Amended Complaint alleging "DAMAGES COMMON TO ALL CAUSES OF ACTION IN PLAINTIFF'S COMPLAINT." Specifically, in the subsection alleging "Michael's Damages," Defendant asserts essentially identical responses to paragraphs 58 and 61 of the Amended Complaint, which are set out in pertinent part or in full above in § I.B., as well as paragraph 59, which was not quoted above but which alleges only that the damages exceed $75,000. *See* Filing 109 at 14–15; Filing 113 at 9. Defendant's response to paragraph 60 of the Amended Complaint, as set out in full above in § I.B., is different, however. Paragraph 60 alleges that Michael's damages on a "*Wrongful Death Claim*" include Elizabeth's damages for emotional distress and her loss of Michael's financial support and services. *See* Filing 109 at 15 (¶ 60). To that allegation, Defendant responded as follows:

> 60.    In response to paragraph 60, the United States admits its negligent act or omission caused the death of Mr. Hansen but disputes the nature and extent of Ms. Hansen's damages. To the extent Plaintiff is attempting to veiledly assert some additional, unknown claim other than "medical negligence" or "negligent failure to warn," it is denied.

Filing 113 at 9 (¶ 60). Similarly, in the subsection alleging "Lisa's Damages," Defendant makes essentially identical responses to paragraphs 63 and 66 of the Amended Complaint, also set out in full above in § I.B., as well as paragraph 66, which was not quoted above but which alleges only that the damages exceed $75,000. Filing 109 at 16–17; Filing 113 at 10. Defendant's response is different to paragraph 65 of the Amended Complaint, also set out in full above in § I.B. Paragraph 65 alleges Elizabeth's damages for emotional distress. *See* Filing 109 at 16–17. To that allegation, Defendant responded as follows:

> 65.    In response to paragraph 65, the United States admits that it was negligent, and Plaintiff incurred damages, but disputes the nature and extent of those damages. To the extent Plaintiff is attempting to veiledly assert some additional, unknown claim other than "medical negligence" or "negligent failure to warn," it is denied.

Filing 113 at 10 (¶ 65). Thus, it could not be clearer that Defendant did not admit liability for any damages for any claims other than "medical negligence" and "negligent failure to warn" and that Defendant denied liability for Elizabeth's "emotional distress" damages.

Finally, the first unnumbered paragraph at the end of the Amended Complaint states the following:

> WHEREFORE, Plaintiffs pray for Judgment against Defendant, on the First, Second, and Third Causes of Action for the general and special damages that Plaintiffs have sustained and/or will sustain; prejudgment and post-judgment interest thereon at the highest legal rate; the costs of this lawsuit; attorney fees; and such further relief as the Court deems just and equitable.

Filing 109 at 17.[3] Defendant responded that this prayer requires no response, "but insofar as a response is required, the United States admits that it was negligent, and Plaintiff incurred damages, but disputes the nature and extent of those damage." Filing 113 at 10. This allegation

---

[3] Again, the Amended Complaint contains a third cause of action for "negligent hiring, training, and supervision," but Plaintiff acknowledged that the Court previously dismissed that cause of action with prejudice, and Plaintiff states that third cause of action is included "[f]or purpose of the record." Filing 109 at 12 and n.1.

and response do not change the scope of Defendant's admission. Defendant has made no admission of liability for any damages for any claims other than "medical negligence" and "negligent failure to warn," and Defendant has expressly denied liability for Elizabeth's "emotional distress" damages.

Thus, there is no uncertainty about the scope of Defendant's admission of liability that might justify presentation of evidence on liability. This part of Defendant's Motion in Limine is granted as to the evidence listed.

       2.      *Offers of Settlement or Subsequent Remedial Measures*

Category 3 in Defendant's Motion in Limine is "[a]ny reference to settlement discussions, negotiations, or an offer of judgment," and Category 4 is "[a]ny reference to policies, procedures, or staffing changed or put into effect after October 27, 2020." Filing 129 at 1 (¶¶ 3–4). In its Brief, Defendant combines these two categories under the heading, "PLAINTIFF SHOULD BE PRECLUDED FROM REFERRING TO ANY OFFERS OF SETTLEMENT OR SUBSEQUENT REMEDIAL MEASURES." Filing 131 at 3.

Defendant argues that Plaintiff should be precluded from offering evidence, argument, or testimony about any settlement offers, mediations, or offers of judgment exchanged between the parties pursuant to Federal Rule of Evidence 408 and Federal Rule of Civil Procedure 68(b). Filing 131 at 3. Defendant also argues that Plaintiff should be precluded from offering evidence, argument, or testimony regarding policy, procedure, or staffing changes that were implemented after Michael was notified that the Omaha VA Hospital failed to follow-up on his CT scan as barred on issue of negligence and irrelevant pursuant to Federal Rules of Evidence 407 and 402. Filing 131 at 3.

Plaintiff states that she does not intend to offer evidence of any offers of settlement and that the same prohibition should be extended to Defendants. Filing 133 at 11. However, Plaintiff argues that evidence inadmissible under Rule 408(a) may be admissible under Rule 408(b), so the Court should reserve ruling on "conduct or statements made during compromise negotiations about a claim" until an issue arises at trial. Filing 133 at 12. Similarly, Plaintiff argues that Defendant's request to exclude evidence of subsequent remedial measures is too vague for the Court to rule on at this time. Filing 133 at 12.

In reply, Defendant points out that the exceptions in Rule 408(b) simply are not applicable here. Filing 143 at 2. Defendant also argues that Plaintiff has not identified any examples of evidence of subsequent remedial measures that would be admissible for a proper purpose under Rule 407. Filing 143 at 2.[4] Defendant points out that Plaintiff did not dispute exclusion of offers of judgment under Rule 68(b). Filing 143 at 3.

The Court finds that Defendant has set out with sufficient specificity the evidence it seeks to exclude pursuant to Rules 408 and 407 and that Plaintiff has generally acquiesced to exclusion of such evidence. As the party asserting that some evidence may fall within the exceptions set out in Rule 408(b) or Rule 407 and this ruling, Plaintiff will be required to seek leave to offer evidence falling within an exception to this ruling. This part of Defendant's Motion in Limine is granted.

3.   *Applicability of the Nebraska Hospital-Medical Liability Act*

The next category of evidence Defendant seeks to exclude is more hotly disputed. It concerns "[a]ny reference that the Nebraska Hospital-Medical Liability Act is inapplicable in this case," which caps the total amount recoverable from a qualified healthcare provider for any

---

[4] Defendant apparently inadvertently referenced Rule 408 for such exceptions, but they are set out in Rule 407.

occurrence resulting in any injury or death of a patient. Filing 129 at 1 (¶ 5); Neb. Rev. Stat. § 44-2821, § 44-2825. The Court begins its analysis of this category of evidence with a summary of the parties' arguments.

a.   The Parties' Arguments

Defendant's initial argument is brief. Defendant concedes the Omaha VA Hospital has not complied with the requirements of § 44-2824(1) to be a qualified healthcare provider under the Act. Filing 131 at 4. Nonetheless, Defendant contends that the Act applies to Federal Tort Claims Act cases against the United States even if the government did not comply with the requirements of the Act. Filing 131 at 4 (citing *Lozada For & on Behalf of Lozada v. United States*, 974 F.2d 986, 987 (8th Cir. 1992)). Thus, Defendant argues that Plaintiff should be precluded from arguing that she is entitled to damages in excess of the statutory cap. Filing 131 at 4.

Plaintiff argues first that this part of Defendant's Motion in Limine should be denied because it is a backdoor summary judgment motion. Filing 133 at 12–13. Plaintiff argues that healthcare providers who fail to meet the Act's qualifications are not covered by the Act's cap provision and that Defendant concedes that it is not qualified. Filing 133 at 13. Plaintiff asserts that *Lozada* on which Defendant's rely is unavailing because unlike the military hospital in that case Defendant has not offered to pay Plaintiff's damages up to the cap, so it is not in "like circumstances" to qualified healthcare providers in Nebraska. Filing 133 at 15. Plaintiff also contends that Defendant's contention is not ripe until and unless the Court finds that the damages in this case exceed the statutory cap. Filing 133 at 16–17.

In reply, Defendant argues that *Lozada* does not impose a requirement that the healthcare provider has offered to pay up to the Act's cap on damages; rather, Defendant argues that the

controlling fact in *Lozada* was that the federal government had the ability to pay up to the cap, thereby placing it in "like circumstances" to qualified health care providers. Filing 143 at 3 (citing *Lozada*, 974 F.2d at 988). Defendant argues that Congress has appropriated funds to pay judgments against the United States, 31 U.S.C. § 1304, which puts the Omaha VA Hospital in "like circumstances" to qualified healthcare providers based on ability to pay up to the cap as equivalent to having paid the required contribution to the compensation fund. Filing 143 at 3.

      b.   The Applicability Question Is Reserved but Reference to the Nebraska Act Is Irrelevant

As helpful background, the Court notes that the Eighth Circuit Court of Appeals summarized the key provisions of the Nebraska Hospital-Medical Liability Act as follows:

> More than 40 years ago, the Nebraska legislature passed the Nebraska Hospital Medical Liability Act ("Act") to curb meritless medical malpractice claims and efficiently resolve meritorious ones. Neb. Rev. Stat. § 44-2801. The Act caps malpractice damages according to the time of occurrence. *Id*. § 44-2825(1). For incidents between 2004 and 2014, such as this case, the cap is $1.75 million. *Id*. Capped damages are allocated between two sources. The first is the health care provider, whose liability is capped at $500,000 per occurrence. *Id*. § 44-2825(2). The second is the "Excess Liability Fund" set up by the Act, which pays the remainder of damages up to the total cap. *Id*. § 2825(3).

> The Act does not apply automatically, and it has a notable opt-out provision. A health care provider must affirmatively qualify for the Act's protections by filing proof of financial responsibility and paying into the Excess Liability Fund. *Id*. § 44-2824(1). A provider who does not qualify is "subject to liability under doctrines of common law." *Id*. § 44-2821(1). And even when a provider does qualify, a patient may opt out. *Id*. § 44-2821(2). To facilitate this opt-out right, a qualified health care provider must post a sign in its "waiting room or other suitable location" notifying patients that they are subject to the Act unless they opt-out. *Id*. § 44-2821(4).

*Schmidt v. Ramsey*, 860 F.3d 1038, 1043 (8th Cir. 2017); *Lozada For & on Behalf of Lozada v. United States*, 974 F.2d 986, 987 (8th Cir. 1992) (providing a similar summary). For present purposes, the Court adds that since December 31, 2014, until December 31, 2024, the healthcare provider's liability for an occurrence is capped at $500,000, Neb. Rev. Stat. § 44-2825(2), while

the cap on total liability is "two million two hundred fifty thousand dollars [($2,250,000)] for any occurrence," *Id.* at § 44-2825(1).

The Court concludes that the issue of whether any references to the Nebraska Hospital-Medical Liability Act should be allowed at trial can be answered—albeit probably not to the satisfaction of either party—without determining whether this part of Defendant's Motion is a summary judgment motion masquerading as a motion in limine and without determining whether the Nebraska Act is applicable in this case. If this case were set for a jury trial, the Court would simply preclude any reference to or argument about the Nebraska Act in front of the jury— because applicability of the Nebraska Act turns on interpretation of provisions of that Act and perhaps the FTCA. The Court would then reserve for post-trial motions a determination of whether the Nebraska Act applies and what effect if any it has on the verdict. Even where the Court is the trier of fact, there is no need to rule otherwise, because the Court will ultimately make all necessary determinations, whether they are legal or factual.

Therefore, this part of Defendant's Motion in Limine is granted. The issue of the applicability of the Nebraska Hospital-Medical Liability Act is reserved for post-trial motions.

### 4.    *References to Michael's Medical Expenses*

Next, Defendant argues that Plaintiff should be precluded from referring to the amount of Michael's medical expenses. Filing 131 at 4. Defendant argues that because Michael was fully service connected, all his medical expenses were paid by the VA pursuant to 38 U.S.C. § 1710. Filing 131 at 4. Defendant argues that "apart from some band-aids and gauze pads used at home," neither Michael nor Elizabeth incurred any medical expenses, so any such evidence of medical expenses is irrelevant. Filing 131 at 4. If Plaintiff argues that the medical expenses are somehow relevant to damages and that Defendant cannot claim a credit for its payments under

the collateral source rule, Defendant argues the theory behind the collateral source rule is inapplicable where it is both the tortfeasor and the source of the payments. Filing 131 at 5.

Plaintiff argues that this is another untimely summary judgment motion because Defendant is asserting without any evidentiary support that all Michael's medical expenses were paid by Defendant. Filing 133 at 17. Plaintiff asserts that the Joint Evidentiary Stipulation of the Parties is that Michael incurred $148,574.28 for medical care and supplies; $32,840.00 for medications used in connection with cancer treatment; and $6,600 for hospice care in connection with his cancer treatment and end-of-life care. Filing 133 at 17–18. Plaintiff contends it is well established that medical expenses are recoverable damages under either common law or the Nebraska Hospital-Medical Liability Act. Filing 133 at 18. Plaintiff argues that it is impermissible for Defendant to claim a credit for medical expenses allegedly paid while asserting Plaintiff's damages are capped under the Nebraska Act. Filing 133 at 18. She argues that Nebraska law provides that an insurer cannot recover under subrogation until an insured is made whole. Filing 133 at 18.

In reply, Defendant argues that it is Plaintiff's burden to prove she incurred any medical expenses, but she admitted in deposition testimony that the VA paid for all Michael's past medical expenses, except some band-aids and gauze pads. Filing 143 at 4. Defendant also argues that it is not asserting a right to subrogation where it did not pay an obligation that another should have paid because the VA was required to pay Michael's medical expenses in the first place. Filing 143 at 4.

The Court concludes that neither subrogation nor the collateral source rule has any application here where the party that has paid medical expenses (or legally must do so independent of any wrongdoing, *see* 38 U.S.C. § 1710), is the Defendant. Furthermore,

Defendant is correct that Elizabeth testified in deposition, "Most of Michael's medical was done at the V.A., and, therefore, there, there was no expenses. However, such as Band-Aids, different pillows, gauze pads, and things of that nature, that we probably purchased." Filing 130-1 at 3 (E. Hansen depo. 156:11–15. She estimated the past cost of band-aids to cover his fistula for dialysis at $15 per month, the cost of gauze pads at about $10 to $15 per month, and approximately $300 total for pillows, with no future medical expenses. Filing 130-1 at 3–4 (E. Hansen Depo. 156:16–157:23). Furthermore, Defendant is correct that Plaintiff bears the burden to prove the amount as well as causation of damages. *Hill v. City of Lincoln*, 541 N.W.2d 655, 660 (Neb. 1996) ("In order to succeed in an action based on negligence, a plaintiff must establish the defendant's duty not to injure the plaintiff, a breach of that duty, proximate causation, and damages."); *Cooper v. Hastert*, 124 N.W.2d 387, 389 (Neb. 1963) ("Both proximate cause and the amount and nature of the damages were issues in this case. Failure to meet the requisite burden of proof would require a verdict for the defendant."). With the exception of the items of medical expenses that Elizabeth identified as paid out-of-pocket or not paid by the VA, Plaintiff may not present evidence of any medical expenses at trial.

This part of Defendant's Motion is granted except that Plaintiff shall be allowed to present evidence of medical expenses previously identified as having been paid out-of-pocket or not paid by the VA.

### 5.    *Financial Disparities Between the Parties*

Defendant also asserts that Plaintiff should be precluded from asserting any financial disparity between the parties, such as stating that the United States has unlimited resources or is self-insured. Filing 131 at 5. Plaintiff states that she does not intend to offer evidence of the financial disparity between the parties and does not object to Defendant's motion on that issue.

Filing 133 at 20. Plaintiff adds that she does not intend to offer evidence of any liability insurance of Defendant, as no applicable insurance policy has been identified by Defendant. Filing 133 at 20. Plaintiff then makes a further *non sequitur* argument that she does not intend to argue for punitive or exemplary damages, but that Defendant's Motion seeks to limit her testimony in a vague manner when the emotional impact of Defendant's negligence on both Michael and Elizabeth should be admissible. Filing 133 at 20.

The only issue presented by this part of Defendant's Motion in Limine is whether Plaintiff should be precluded from pointing out any financial disparity between the parties, such as stating that the United States has unlimited resources or is self-insured, and Plaintiff does not object to Defendant's Motion on that issue. Filing 131 at 5. Any further ruling would exceed the scope of the question properly before the Court.

This part of Defendant's Motion in Limine is granted, and Plaintiff will be precluded from asserting any financial disparity between the parties.

### 6.    *Undisclosed Materials*

In the penultimate part of Defendant's Motion, Defendant seeks exclusion of any VA documents or materials from other cases or litigation in which Defendant's current counsel was not involved. Filing 131 at 6. Defendant argues that allowing such materials would constitute unfair surprise, would be unduly prejudicial, and would violate discovery rules. Filing 131 at 6. Plaintiff "does not object" to the request to exclude any documents or material not produced in the case, so long as the order is consistent with Federal Rule of Civil Procedure 37(c)(1). Filing 133 at 20. Plaintiff requests a "reciprocal order," but points out that there is an exception to disclosure under Rule 26(a) for matters used solely for impeachment. Filing 133 at 20–21.

Defendant agrees to Plaintiff's contention that documents used solely for impeachment are not excluded. Filing 143 at 5.

The Court is frustrated by motions in limine that simply ask the Court to follow well established evidentiary and procedural rules. Nevertheless, gratified by this sole instance of what appears to be complete agreement between the parties on a reasonable limitation—albeit one already imposed by the applicable rules, including Federal Rule of Civil Procedure 37(c)—the Court will grant this part of Defendant's Motion.

       7.    *Elizabeth's Emotional Distress Damages*

The last category of evidence Defendant seeks to exclude is another that is hotly contested. That category is "[a]ny reference to emotional damages Ms. Hansen has incurred or may incur in the future, including mental suffering or anguish, bereavement, or solace." Filing 129 at 2 (¶ 9); Filing 131 at 6 ("PLAINTIFF SHOULD BE PRECLUDED FROM REFERRING TO ANY ALLEGED EMOTIONAL DAMAGES SHE INCURRED OR MAY INCUR IN THE FUTURE.").

       a.  The Parties' Arguments

Defendant asserts that under Nebraska law, Elizabeth may seek damages for the pecuniary value of the services, comfort, and companionship that Michael would have contributed, had he not passed away, but the Court cannot award damages for her mental suffering or anguish, bereavement, or solace. Filing 131 at 6. Thus, Defendant argues that Elizabeth should be precluded from offering evidence of her own emotional distress. Filing 131 at 6.

To Defendant's four sentences seeking exclusion of this evidence, Filing 131 at 6, Plaintiff argues for nearly five pages that this evidence should be admitted, Filing 133 at 21–25.

Plaintiff asserts first that this is another disguised summary judgment motion. Filing 133 at 21. Plaintiff then argues that the motion is "misplaced" because it fails to account for her "entirely separate cause of action for the emotional distress damages she incurred as a result of the Omaha VA's negligence." Filing 133 at 21. Plaintiff acknowledges that the Nebraska wrongful death statutes do not authorize damages for mental suffering, anguish, bereavement, or solace, but they do allow damages for her loss of support, society, comfort, and companionship, which she argues "touch on" emotional support that Michael provided her and allow her to testify to how her life has changed since the premature death of her husband as a result of Defendant's negligence. Filing 133 at 21–22. Plaintiff also argues that "Lisa has always separately maintained she is entitled to emotional distress damages directly, as a result of the Omaha VA's negligence," pointing to Filing 1 at 14–15 (¶ 63) and Filing 109 at 15 (¶ 65). Filing 133 at 22. She asserts that Nebraska law recognizes two claims for negligent infliction of emotional distress—"direct victim" and "bystander"—both of which apply to her. Filing 133 at 22–24. Plaintiff argues that if Defendant believed her claims for emotional distress damages were legally deficient, it should have filed a motion for summary judgment on that issue. Filing 133 at 25.

In reply, Defendant first reiterates that Nebraska law expressly prohibits an award of punitive damages and damages for a next of kin's pain and suffering. Filing 143 at 6. Defendant then argues that it has properly moved in limine to narrow or eliminate unnecessary evidentiary issues and interruptions at trial. Filing 143 at 6. Defendant also argues that Plaintiff should be precluded from offering evidence, testimony, or argument on a claim for negligent infliction of emotional distress because Elizabeth has no evidence of medically diagnosable and significant emotional distress that is also so severe that no reasonable person could have been expected to endure it, as required under Nebraska law. Filing 143 at 6. Defendant points to Elizabeth's

28

deposition testimony in which Defendant contends she admitted that any emotional distress she suffered after Michael was diagnosed with cancer was not diagnosed by a medical professional nor was it significant enough to warrant any medical treatment. Filing 143 at 7.

> ### b. Plaintiff Has Not Pleaded a Cause of Action for Negligent Infliction of Emotional Distress

The Court does not agree with Plaintiff that exclusion of evidence of emotional distress damages should have been the subject of a motion for summary judgment rather than a motion in limine. As one of my colleagues explained,

> "A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Louzon v. Ford Motor Co.,* 718 F.3d 556, 561 (6th Cir.2013) (quoting *Luce v. United States,* 469 U.S. 38, 40 n. 2 (1984)). A motion in limine is used "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions;" in contrast, a motion for summary judgment is a mechanism for resolving non-evidentiary matters prior to trial. *Louzon,* 718 F.3d at 561. Courts should not effectively convert a motion in limine into one for summary judgment: Bypassing the procedural protections of Rule 12(b)(6) and Rule 56, and delaying a ruling on potentially dispositive issues until the eve of trial, may prejudice the non-moving party's ability to respond to the motion and develop or refine its trial strategy and preparation. *Louzon,* 718 F.3d at 562 (collecting cases).

*Bliss v. BNSF Ry. Co.,* No. 4:12CV3019, 2013 WL 5570231, at *2 (D. Neb. Oct. 9, 2013). What is at issue here is exclusion of anticipated prejudicial evidence before the evidence is actually offered, thus narrowing the evidentiary issues for trial. *Id.* This is so, because no cause of action for negligent infliction of emotional distress has been pleaded, and emotional distress damages are not available on the negligence causes of action for wrongful death that have been pleaded, so introducing evidence of emotional distress damages would be unfairly prejudicial.

As the Court explained in its statement of the procedural background to this case in § I.B. above, in her Amended Complaint, Plaintiff asserts two causes of action, the first for "medical

negligence" and the second for "negligent failure to warn." Filing 109 at 7–11 (¶¶ 37–49).[5] In a separate section of the Amended Complaint entitled "DAMAGES COMMON TO ALL CAUSES OF ACTION IN PLAINTIFF'S COMPLAINT," Plaintiff has separate subsections for "Michael's Damages (Wrongful Death and Survival)" and "Lisa's Damages." Filing 109 at 14–17. The Court also explained in § II.B.1.b. that in the subsection for "Michael's Damages," Plaintiff alleges that Michael's damages on a "*Wrongful Death Claim*" include Elizabeth's damages for emotional distress and her loss of Michael's financial support and services. *See* Filing 109 at 15 (¶ 60) (emphasis in the original). Defendant responded to that allegation in pertinent part here, "To the extent Plaintiff is attempting to veiledly assert some additional, unknown claim other than 'medical negligence' or 'negligent failure to warn,' it is denied." Filing 113 at 9 (¶ 60). As the Court also explained, in § II.B.1.b., Plaintiff again alleged Elizabeth's damages included damages for emotional distress, *see* Filing 109 at 16–17, to which Defendants provided an identical response. Filing 113 at 10 (¶ 65).

This reiteration of the pleadings demonstrates that contrary to Plaintiff's contention, Plaintiff has never pleaded an "entirely separate cause of action for the emotional distress damages [Elizabeth] incurred as a result of the Omaha VA's negligence." Filing 133 at 21. Nor has Elizabeth "always separately maintained she is entitled to emotional distress damages directly, as a result of the Omaha VA's negligence," by pointing to Filing 1 at 14–15 (¶ 63) and Filing 109 at 15 (¶ 65). Filing 133 at 22. What she has pleaded is that she is entitled to emotional distress damages as relief on the only two causes of action she has alleged—that is, the causes of action for "medical negligence" and "negligent failure to warn"—and Defendant repeatedly disputed the availability of emotional distress damages on those causes of action. Under

---

[5] Again, Plaintiff also repleaded a third negligence claim, but Plaintiff acknowledges that claim has already been dismissed.

Nebraska law, "damages are not recoverable for mental suffering or anguish, bereavement, or solace" in an action for wrongful death, such as an action for "medical negligence" and "negligent failure to warn." *Williams v. Monarch Transp., Inc.*, 470 N.W.2d 751, 756 (Neb. 1991). Thus, a prayer for emotional distress damages on the causes of action actually pleaded is barred as a matter of law.

This conclusion is not undermined by the reiteration in *Hamilton v. Nestor* that "[w]e have stated that an 'emotional distress claim is not a cause of action, but, rather, a separate theory of recovery or element of damage.'" 659 N.W.2d 321, 324 (Neb. 2003) (quoting *Fackler v. Genetzky*, 595 N.W.2d 884, 891 (Neb. 1999)). In *Hamilton*, the plaintiff sued the driver of another vehicle for negligence that caused a motor vehicle collision. *Id.* at 758. The collision killed the other driver and his passenger, while it allegedly caused the plaintiff "mental and psychological injuries, including posttraumatic stress disorder." *Id.* The Nebraska Supreme Court characterized the case as "a civil action for damages based upon allegations of negligent operation of a motor vehicle on a public highway." *Id.* at 760. The court added that "the injury claimed by Hamilton can be fairly described as 'mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms.'" *Id.* at 760–61 (quoting *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 544 (1994)). The difference between *Hamilton* and this case is obvious: Hamilton did not assert a wrongful death claim, so he could assert a prayer for emotional distress damages as a theory of recovery on a negligence cause of action, but here Plaintiff is asserting a wrongful death cause of action on which emotional distress damages are not an available theory of recovery. *See Williams*, 470 N.W.2d at 756.

Thus, to recover such damages, Plaintiff must assert a separate cause of action for negligent infliction of emotional distress, but she has not done so.

      c.  Elizabeth's Emotional Distress Is Not Relevant to Allowable Damages

The Court also rejects Plaintiff's argument that Elizabeth's allowable damages for her loss of support, society, comfort, and companionship "touch on" emotional support that Michael provided her and allow her to testify to how her life has changed since the premature death of her husband as a result of Defendant's negligence. Filing 133 at 21–22. Perhaps not surprisingly, Plaintiff cites nothing in support of this proposition.

As the Nebraska Supreme Court explained,

> Speiser reminds us of the difference between compensation for mental anguish, bereavement, or solace and compensation for loss of society, comfort, and companionship:
>
> > When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one.... The fundamental question in this area of damages is what deleterious effect has the death, as such, had upon the claimants? In other areas of damage, we focus on more positive aspects of the injury such as what would the decedent, had he lived, have *contributed* in terms of support, assistance, training, comfort, consortium, etc.
>
> (Emphasis in original.) 1 S. Speiser, Recovery for Wrongful Death § 3:52 at 327 (2d ed. 1975).

*Williams*, 470 N.W.2d at 756. What is relevant and admissible under the wrongful death statute is evidence of the decedent's relationship with his or her next of kin, not evidence of the pain, suffering, or anguish felt by the next of kin. *Id.* at 756–57.

d.  Alternatively, Even Imagining that the Amended Complaint
Attempts to Plead a Cause of Action for Negligent Infliction of
Emotional Distress, Plaintiff Offers No Evidence Sufficient to
Submit the Cause of Action to the Factfinder

Even imagining that Plaintiff's Amended Complaint attempts to plead a cause of action

for negligent infliction of emotional distress (which it does not), it offers no evidence sufficient

to submit the cause of action to a factfinder.[6] The Amended Complaint identifies no such

evidence, because all the allegations concerning Elizabeth's emotional distress, emotional

anguish, post-traumatic stress, mental harm, and mental injury are set out in paragraphs 60, 63,

and 65, which are quoted in this decision, are all entirely conclusory with no allegations of

factual support. Also, "[s]evere emotional distress is also an element of the tort of negligent

infliction of emotional distress." *Kant v. Altayar*, 704 N.W.2d 537, 540 (Neb. 2005) (citing

*Hamilton v. Nestor*, 659 N.W.2d 321 (Neb. 2003), and *Sell v. Mary Lanning Memorial Hosp.*,

498 N.W.2d 522 (Neb. 1993)). Indeed, the requirement is "that the emotional anguish or mental

harm for which recovery is sought must be medically diagnosable and must be of sufficient

severity that it is medically significant." *Hamilton*, 659 N.W.2d at 329. Furthermore, "actionable

emotional distress must also be 'so severe that no reasonable person could have been expected to

endure it.'" *Id.* (quoting *Sell*, 498 N.W.2d at 525).

Elizabeth's own deposition testimony from December 20, 2022, demonstrates the

insufficiency of her evidence to warrant submission of any claim of negligent infliction of

emotional distress to the factfinder. Elizabeth described her "mental harm and injuries" as "like a

broken record that plays over and over, and it never stops, and it plays the nightmare

continually," explaining that what was playing on that broken record was "that the V.A. knew,

---

[6] Indeed, the Court does not believe that Plaintiff pleaded sufficient facts to make such a claim plausible, and the Court does not believe it could properly submit a claim to a factfinder that is not pleaded sufficiently to state a claim.

didn't tell your husband, and the ultimate price he paid was death." Filing 138-1 at 2–3 (E.
Hansen depo. at 188:17–189:2). She explained that made her feel "furious," "angry," "sad,"
"mad," "devastated," "destroyed," and she then added that "[e]very day I feel like a little piece of
me dies." Filing 138 at 3 (E. Hansen depo. at 189:3–6). However, Elizabeth answered "no" when
asked if she was doing anything to treat the mental harm and injury. Filing 138 at 3 (E. Hansen
depo. at 189:10–12). When reminded that her Amended Complaint alleged "PTSD," she
explained, "It's reliving the whole experience of being told that they waited 15 months to tell my
husband he had cancer," but again she answered "no" when asked if she was getting any
treatment for PTSD. Filing 138-1 at 3 (E. Hansen depo. at 189:17–25). She testified that she had
not been to a counselor or therapist and when asked if she had plans to do that in the future, she
answered "possibly," but then added, "I'm kind of a private person, and, to be honest, I feel I'm
pretty strong-willed, and I'm not saying that mental health is a weakness for anybody, I just --
how can they help me? I don't believe that anything will make me feel better." Filing 138-1 at 4
(E. Hansen depo. at 190:1–13). She also answered "no" when asked if she had been diagnosed
by a mental health professional. When asked to explain her severe emotional anguish and
distress, Elizabeth answered, "Again, the same thing, it -- it's -- my husband is dead. I don't
know how else to say it. I mean, if you don't have distress, then maybe you -- I don't know what
to say," and she said "no" when asked if she had anything else to tell counsel. Filing 138-1 at
190: 17–191:3).

 This deposition testimony shows that Elizabeth's distress—which the Court does not
doubt is genuine—is "emotional anguish or mental harm for which recovery is sought," but it is
not medically diagnosed, does not appear to be "medically diagnosable," and more importantly
was not treated, which demonstrates that it is not "of sufficient severity that it is medically

significant." *Hamilton*, 659 N.W.2d at 329. Still more importantly, this testimony demonstrates that Elizabeth's emotional distress is not "so severe that no reasonable person could have been expected to endure it." *Id.* (internal quotation marks and citation omitted). Based on this testimony, there is no admissible evidence of actionable emotional distress, there is no claim for emotional distress that could be submitted to the factfinder, and what evidence is in the record must be excluded at trial as prejudicial and a waste of time.

The Court acknowledges that a somewhat different picture is painted by an undated Psychological Evaluation of Elizabeth by Thomas J. Haley, Ph.D. Filing 134-9. Contrary to Elizabeth's deposition testimony—or perhaps subsequent to her deposition testimony— Dr. Haley did an evaluation "to determine Ms. Hansen's present mental state since Mr. Hansen's death on December 30, 2021." Filing 134-9 at 1. Dr. Haley states that the tests given for his evaluation included the personal history questionnaire, the PCL-5, and MMPI-2 Restructured Form. Filing 134-9 at 1. Dr. Haley's evaluation states,

> In summary, diagnostically Ms. Hansen is demonstrating symptoms in the presence of posttraumatic stress disorder, severe. This is directly related to her experience from 2002 [sic] to the present time. She was the main caregiver for her husband. She was present at the stage IV cancer diagnosis that was given by her husband's doctors. She continued to be [the] caregiver for her husband for the next 4 months as the cancer spread and eventually killed him.
>
> It is recommended for people with posttraumatic stress disorder to get individual psychotherapy in addition to appropriate medication. In Ms. Hansen's case, it is recommended she have weekly psychotherapy for a period of five years.

Filing 134-9 at 2. What this evaluation ultimately adds is only a diagnosis of PTSD, however. In other words, it demonstrates that Elizabeth's PTSD is "medically diagnosable" and "medically significant." *Hamilton*, 659 N.W.2d at 329. Yet, there is still no evidence of treatment—even as suggested by Dr. Haley—which demonstrates that Elizabeth's emotional distress is not "so

severe that no reasonable person could have been expected to endure it." *Id.* (internal quotation marks and citation omitted).

This part of Defendant's Motion in Limine is granted.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.      Defendant's Motion in Limine to Exclude Certain Opinions of Plaintiff's Economist Dr. William Rogers, Filing 126, is denied; and

2.      Defendant's Motion in Limine, Filing 129, is granted in part and denied in part as set out above.


Dated this 17th day of November, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge